**Duncan QUARLESS, Plaintiff,**

v.

**BRONX–LEBANON HOSPITAL CENTER and Sheldon Ortsman, Vice–President of Bronx–Lebanon Hospital Center, Defendants.**

**No. 99 CIV.4414 (RMB).**

United States District Court,
S.D. New York.

Sept. 27, 2002.

---

### *ORDER*

BERMAN, District Judge.

Duncan Quarless ("Quarless" or "Plaintiff") filed this action against Bronx–Leba-

non Hospital Center ("Bronx–Lebanon"), his former employer, and Sheldon Ortsman, Director of Human Resources at Bronx–Lebanon, who supervised Mr. Quarless during his tenure at the hospital (collectively "Defendants"). In his amended complaint, filed July 30, 1999 ("Am. Compl."), Mr. Quarless alleged, among other things, race discrimination, disparate pay and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et. seq. (1994) ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et. seq. ("NYSHRL"), and the New York City Human Rights Law, N.Y. Admin. Code § 8–101 et. seq. ("NYCHRL").

On August 15, 2000, this Court granted the Defendants' motion to dismiss the Plaintiff's failure to promote and retaliation claims under Title VII on statute of limitations grounds. *See* Order dated August 15, 2000 at 7–10. It also dismissed the Plaintiff's hostile work environment and constructive discharge claims, as well as the Plaintiff's state law failure to promote claim. *Id.* at 10–13. The Court denied the Defendants' motion to dismiss as to the Plaintiff's federal, state and city disparate pay claims, *id.* at 6–7, 12 ("Plaintiff has alleged a prima facie case of disparate pay under Title VII and ... under the State Human Rights Law and NYC Human Rights Law"), as well as the Plaintiff's state and municipal law retaliation claims. *Id.* at 12–13 ("Plaintiff sets forth a prima facie case of state and local Human Rights Law retaliation.").

On December 26, 2001, the Defendants moved for summary judgment ("Def.Mem.") under Rule 56(c) of the Federal Rules of Civil Procedure arguing, among other things: (1) that Mr. Quarless failed to produce any evidence to support his disparate pay or retaliation claims; and (2) that the Plaintiff's claims under both federal and state statutes were not timely

filed. **For the reasons set forth below, the Defendants' motion is granted.**

# I. Background

In February 1992, Bronx–Lebanon hired the Plaintiff as the Director of Labor Relations in its Human Resources Department. *See* Employee Requisition, Plaintiff's Ex. 27. The Plaintiff's duties at Bronx–Lebanon included responsibility for labor-management relations with various employee unions and employee relations with non-union staff, including "grievance handling, arbitration preparation, supervisory development and development of preventive labor/employee relations approaches and policies." *See id.*

The Plaintiff's starting salary in his position as Director of Human Resources was $72,000 per year. *See* Am. Compl. at ¶ 11. In July 1993, Bronx–Lebanon gave the Plaintiff a 2% pay raise, bringing his annual salary to approximately $74,000. *See id.* at ¶ 13. The Plaintiff felt that this raise was inadequate, and he complained to his immediate supervisor, Dr. Ralph Staulcup, the Vice President of Human Resources ("Staulcup"), on December 1, 1993. *See id.* at ¶ 14. Bronx–Lebanon then adjusted the Plaintiff's salary upward by 1.4% on December 20, 1993, thereby increasing the Plaintiff's annual salary to approximately $75,000. *See id.* at ¶ 15.

Sometime in 1994, several black managerial and non-union employees approached the Plaintiff in his capacity as the Director of Labor Relations to complain about a disparity in pay between them and their white counterparts. *See id.* at ¶ 16. The Plaintiff investigated these complaints and determined that the black employees had a valid claim. *See id.* at ¶ 18. The Plaintiff informed Staulcup of the results of his investigation and Staulcup promised that he would look into the matter. *See id.* at ¶ 18–19. Apparently,

neither Staulcup nor anyone else at Bronx–Lebanon took action in response to the Plaintiff's report. *See id.* at ¶ 19.

In 1995 and 1996, there were two large-scale reductions-in-force at Bronx–Lebanon. *See id.* at ¶ 20. The Plaintiff believed that most of the employees who had complained to him regarding pay inequities had been included on the layoff list, and he complained to Staulcup that the reductions-in-force unfairly targeted minority employees. *See id.* at ¶ 20–21. Staulcup apparently did little in response to the Plaintiff's complaints and the reductions-in-force were implemented. *See id.* at ¶ 21. As a result of these reductions-in-force, Bronx–Lebanon was subjected to United States Equal Employment Opportunity Commission ("EEOC") complaints and lawsuits. *See id.* at ¶ 22.

During the course of one of the lawsuits arising from the reductions-in-force, *Brown v. Bronx Lebanon Hosp. Ctr.*, 97 Civ. 2270, 1997 WL 736700 (S.D.N.Y.1997), the Plaintiff was interviewed by Ms. Ricki Roer, the attorney representing Bronx–Lebanon. *See id.* at ¶ 23. The Plaintiff informed Ms. Roer of his investigations regarding pay disparities at Bronx–Lebanon, and he further stated that he believed that there was both statistical and anecdotal evidence to support the claims of plaintiff John Brown. *See id.* at ¶ 24. The Plaintiff also informed Ms. Roer that he believed that he had suffered from disparate pay during his tenure at Bronx–Lebanon. *See id.* at ¶ 25. The Plaintiff believes that Ms. Roer related the contents of this interview to, among others, Defendant Ortsman, the "VIP of Operation and Human Resources" and the Plaintiff's immediate supervisor at the time, and Mr. Ernest Callazo ("Callazo"), Bronx–Leba-

non's outside counsel for labor relations matters. *See id.* at ¶ 25.

In March 1997, after Staulcup left the employ of Bronx–Lebanon, the Plaintiff claims that Defendant Ortsman informed the Plaintiff that he was to be promoted to the position of Assistant Vice–President of Human Resources with a minimum salary of $100,000. *See id.* at ¶ 26. At the time, the Plaintiff states that it was agreed that the Plaintiff would receive an immediate salary increase to $93,000 per year. *See id.* at ¶ 27. In late September 1997, following the Plaintiff's meeting with Ms. Roer in regard to Brown's lawsuit, the Plaintiff wrote to Defendant Ortsman to inquire about the status of his promotion and pay increase. *See id.* at ¶ 29. Defendant Ortsman responded, in a letter dated October 1, 1997,[1] that the Plaintiff "should not presume ... that I have made the decision to create [an Associate Director of Human Resources] position, that I have decided to appoint you to the position, and that you will be receiving a 10% promotional increase retroactive to some prior date." *See* Def. Mem., Ex. M.

During 1998, the Plaintiff complained about his treatment by Defendant Ortsman, stating that his "authority was undermined, he was shunned, and he was kept away from meetings he usually attended." *See* Am. Compl. at ¶ 31. In June 1998, Callazo advised the Plaintiff (apparently verbally) that he should seek employment elsewhere. *See id.;* Plaintiff's Affidavit, Ex. 26, at ¶ 24. The Plaintiff resigned from Bronx–Lebanon on September 25, 1998, *see* Am. Compl. at ¶ 32, and he eventually accepted a lesser position with lower pay at another institution. *See* Plaintiff's Affidavit, Ex. 26, at ¶ 20(g).

On February 1, 1999, the Plaintiff filed an EEOC complaint alleging discrimina-

---

1. Defendant Ortsman noted, in this letter, that the "President would not appoint a position of Assistant Vice President in the Human Re-

sources Department and that the title would be more like Associate Director of Human Resources." *See* Def. Mem., Ex. M.

tion and constructive discharge. *See* Def. Mem., Ex. O. In his EEOC complaint, the Plaintiff claimed, among other things, that he "experience[d] a hostile work environment in this department initiated by his immediate supervisor, Mr. Ortsman," that his "authority was undermined, he was shunned and kept away from meetings he usually attended," and, also, that "he was forced to relinquish his position and accept another position with less money." *See id.* at ¶¶ 21, 22, 23. Upon Plaintiff's request, the EEOC issued a Notice of Right to Sue on April 2, 1999.

## II. Standard Of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under governing law,' [and][a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Therefore, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996).

The moving party has the initial burden of identifying "those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir.2002) (citing *Celotex Corp. v.* *Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party has met this burden, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir.1999); *see also Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996) ("mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment").

In determining whether the nonmoving party has presented sufficient evidence to defeat the defendant's motion for summary judgment, a court must "draw[ ] all factual inferences and resolv[e] all ambiguities in favor of the nonmoving party." *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.1997). "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994). Nevertheless,

[i]t is now beyond cavil that summary judgment may be appropriate even in the fact intensive context of discrimination cases. This Court has stated that: "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Much more recently, the Supreme Court "reiterated that trial courts should not treat discrimination differently from other ulti-

mate questions of fact." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

*Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001) (internal citations omitted).

### III. Analysis

#### A. The Timeliness of Plaintiff's Claims

##### 1. Plaintiff's Title VII Claim

Under Title VII, a claimant must exhaust his or her administrative remedies and do so "in a timely fashion." *Briones v. Runyon*, 101 F.3d 287, 289 (2d Cir.1996). The Plaintiff had "300 days from the time when he ... knew or should have known of [the] adverse employment decision to file a charge of discrimination with the EEOC." *Commodari v. Long Island Univ.*, 89 F.Supp.2d 353, 379 (E.D.N.Y. 2000) (citing 42 U.S.C. § 2000e–5(e)(1) (1994)); *Harris v. City of New York*, 186 F.3d 243, 247 & n. 2 (2d Cir.1999). The Plaintiff filed his EEOC charge on February 1, 1999. Therefore, any alleged unlawful acts which occurred before April 7, 1998 are time-barred, unless the Plaintiff can establish the existence of a continuing violation.

■ The continuing violation doctrine provides that when the discrimination of which the employee complains is part of "a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Miller v. International Telephone & Telegraph Corp.*, 755 F.2d 20, 25 (2d Cir.1985). A plaintiff can establish a continuing violation if he can provide "proof of specific ongoing discriminatory policies or practices or ... specific and related instances of discrimination [which] are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994). Once a continuing violation is established, "all claims of discrimination under [the discriminatory policy] will be timely even if they would be untimely standing alone." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993).

The Plaintiff contends that the disparate pay of which he complains was part of an ongoing pattern and practice of discrimination at Bronx–Lebanon, and that all the actions of which he complains—even those which occurred before April 7, 1998—were within the relevant statute of limitations because they "fall[ ] under the continuing violation doctrine." *See* Plaintiff's Memorandum of Law ("Pl.Mem.") at 9.

The Court disagrees. Because each paycheck that the Plaintiff received was an (alleged) immediate and individual wrong which gave rise to a separate disparate pay claim, the Plaintiff cannot use the continuing violation doctrine to render timely any disparate pay violations which occurred outside the 300 day statute of limitations. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2072, 153 L.Ed.2d 106 (2002) ("discrete discriminatory acts are not actionable if time barred, even when related to acts alleged in timely filed charges"); *Pollis v. New Sch. for Social Research*, 132 F.3d 115, 119 (2d Cir.1997) (stating that "a cause of action based on receipt of a paycheck prior to the limitations period is untimely and recovery for pay differentials prior to the limitations period is barred irrespective of subsequent, similar timely violations");[2] *Meckenberg v. New York*

---

**2.** In light of the *Morgan* decision, *Pollis* applies to Title VII claims as well as to claims under the Equal Pay Act. *See Gross v. Nat'l Broadcasting Co.*, 232 F.Supp.2d 58, 67

*City Off–Track Betting,* 42 F.Supp.2d 359, 371 (S.D.N.Y.1999) (holding that "recurring pay discrimination does not constitute a continuing violation, as each receipt of a paycheck is the basis for a separate cause of action for which suit must be brought within the limitations period").

■ Similarly, each alleged discrete act of retaliation about which the Plaintiff complains should have been the basis of an EEOC charge filed within 300 days of its occurrence. *See Morgan,* 122 S.Ct. at 2073 (noting that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice' " and must be the separate subject of an EEOC charge "within the appropriate time period").

■ The Plaintiff's attempt to invoke the continuing violation doctrine also fails because he has not provided any facts to show that the discrimination that he allegedly encountered was the product of "customs or policies." *Weeks v. New York State,* 273 F.3d 76, 83 (2d Cir.2001). Although the Plaintiff alleges that the Defendants maintained a "policy which paid non-minority employees more than minority employees including him," the Plaintiff's statistical information is insufficient to establish that such a policy existed. *See infra* Section III.B. The Defendants' actions are not shown to be sufficiently related to bring them within the continuing violation doctrine. *Lambert,* 10 F.3d at 53 (noting that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation").

The rejection of the Plaintiff's continuing violation theory is also informed by the

purposes of Title VII's exhaustion requirement. As the United States Supreme Court recently stated, Title VII's procedural requirements should be strictly adhered to because they are " 'the best guarantee of evenhanded administration of the law,' " *see Morgan,* 122 S.Ct. at 2070 (quoting *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980)).

## B. The Plaintiff's Disparate Pay Claims.

■ In order to establish a *prima* facie case of discriminatory disparate pay under Title VII, a plaintiff must show: (1) that he was a member of a protected class; (2) that he was paid less than similarly situated non-members of his protected class; and (3) evidence of discriminatory animus. *See Belfi v. Prendergast,* 191 F.3d 129, 140 (2d Cir.1999). There is no dispute over the first element. Rather, the Defendants argue that the Plaintiff has failed to produce any evidence to show that he was paid less than similarly situated employees outside of his protected class or that the Defendants acted with discriminatory animus.

In order to avoid summary judgment, the Plaintiff must produce some evidence to show that he was paid less than similarly situated employees who were not members of his protected class. *See Belfi,* 191 F.3d at 139. A valid comparison between employees can only be made if they shared "sufficient employment characteristics ... so that they could be considered similarly situated." *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001).

Employees are not "similarly situated" merely because their conduct might be analogized. Rather, in order to be similarly situated, other employees must

(S.D.N.Y.2002) (commenting that *Morgan,* "which states that alleged failures to compensate adequately ... cannot form the basis for

a continuing violation claim," is in accord with *Pollis* ).

have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it.

*Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531, 1547 (S.D.N.Y. 1986).

In his affidavit dated January 9, 2002, the Plaintiff contends that he was denied promised pay raises at his six month and one year anniversaries at Bronx–Lebanon allegedly because of the Hospital's fiscal constraints, while other white managers received "whopping raises." *See* Plaintiff's Affidavit at ¶ 4. However, the Plaintiff does not identify the employees who allegedly received these larger salary increases, and he makes no attempt to establish that any employees who received such pay raises were in positions similar to his. *See* Pl. Mem. at 10 (stating very generally that "other White managers were receiving high raises" and "White managers received whopping and miraculous raises"). While the Plaintiff offers some statistical data regarding the pay rates of various employees at the hospital, including Mr. Neil Pollack and Mr. Mark Barrett, *see* Plaintiff's Affidavit at ¶ 12, Plaintiff fails to show that these employees were similarly situated, *see Francis v. Runyon*, 928 F.Supp. 195, 203 (E.D.N.Y.1996) ("For evidence of other employees to be relevant, the employees must be similarly situated to plaintiff."). The Plaintiff offers only unanalyzed lists of the salaries of other Bronx–Lebanon employees, *see* Def. Mem., Ex. H, without accounting for differences in education, seniority, performance, or specific work duties, *see Bickerstaff*, 196 F.3d at 450 (holding that statistical evidence was "untenable" when it failed to account for "nondiscriminatory explanations for the disparity").

Bronx–Lebanon, on the other hand, has produced strong evidence showing that the Plaintiff was not subjected to disparate pay compared to other directors throughout his tenure at Bronx–Lebanon. Indeed, Plaintiff's "starting salary may have placed [him], as the highest paid Director in the Human Resources Department" and Plaintiff concedes as much. *See* Plaintiff's Affidavit at ¶ 10. Among other things, Bronx–Lebanon's evidence shows that in January, 1996, shortly before the Plaintiff's salary was raised to $93,000 per year, directors of labor relations in the 75th percentile received on average $93,900 per year in the New York Metro Region and $87,400 nationally, *see* Def. Mem., Ex. J, making the Plaintiff's salary above-average among comparable positions in the New York metropolitan area and around the country. In addition, there is unrefuted evidence in the record that the Plaintiff consistently received one of the highest (director) salaries at Bronx–Lebanon. *See* Def. Mem., Ex. C at ¶¶ 4, 8 (stating that the Plaintiff's starting "salary of $72,500 was at the top end of salaries being paid in the health care field to Directors of Labor Relations" and that "[the Plaintiff] received the top directors' salary in the Human Resource Department ... for the years 1992, 1993 and 1994"); Def. Mem., Ex. F at ¶ 8 (stating that a 1998 survey commissioned by Bronx–Lebanon showed that the Plaintiff's "salary was significantly above average for both the New York metropolitan area as well as the national health care field and had been so since 1995"); Def. Mem., Ex. L at ¶ 3 (stating that the Plaintiff "consistently received one of the highest Director salaries in the Hospital, Human Resource Department and health care industry"). The evidence unequivocally establishes that the Plaintiff was well-paid in relation to other directors at Bronx–Lebanon and

other directors of labor relations in New York and around the country.

Part of the Plaintiff's contention appears to be that, although he officially served as Director of Labor Relations at Bronx–Lebanon, in reality he functioned as an assistant vice-president ("A.V.P.") at the hospital. *See* Plaintiff's Affidavit at ¶ 13. The Plaintiff provides no evidence to establish that he was, or that he functioned as, an A.V.P., and he may not defeat the Defendants' motion for summary judgment "through reliance upon unsupported assertions." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). In fact, the Plaintiff's conclusory assertions are contradicted by the record, which contains testimony that the Plaintiff never supervised other employees or undertook the functions of A.V.P.. *See* Def. Mem., Ex. C at ¶ 6; Def. Mem., Ex. F at ¶ 6; Def. Mem., Ex. K at ¶ 4; Def. Mem., Ex. L at ¶ 4.

The Plaintiff has failed to establish a *prima facie* case of discriminatory pay because he has put forward no evidence that he was paid less than other similarly situated employees. As a consequence, the Defendants are entitled to summary judgment on the Plaintiff's disparate pay claims.

## C. Plaintiff's Retaliation Claim

█ Plaintiff contends that he was retaliated against for complaining about his salary and the salaries of other minority employees, arguing that his "disparate pay and raises were refused after [he] complained." *See* Pl. Mem. at 15. To establish a *prima facie* case of retaliation, the Plaintiff must show: "(1) that [he] was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that [he] suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998). The Defendants argue that the Plaintiff did not participate in a protected activity because the Plaintiff's involvement with employment issues at Bronx–Lebanon was (merely) part of his job. *See* Def. Mem. at 11–12.

The Defendants' conception of what is a protected activity is too narrow because the Plaintiff need not show that his protected activity involved the filing of an EEOC claim; he need only establish that he possessed "a good faith reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). The Plaintiff has presented sufficient evidence to demonstrate that he complained that minority employees were subjected to disparate pay, and that he had a reasonable belief that Bronx–Lebanon's conduct in this regard constituted a violation of Title VII. *See* Plaintiff's Affidavit at ¶¶ 8, 16. The Plaintiff has, therefore, produced enough evidence to create a genuine issue of material fact regarding his participation in a protected activity.

█ The Plaintiff is far less persuasive in arguing that he suffered an adverse employment action. The Plaintiff alleges (again generally) that he was "harassed, shunned, and subjected to an intimidating work environment," which allegedly included efforts by others at Bronx–Lebanon to undermine his authority and to exclude him from meetings which he had attended in the past. *See* Am. Compl. at ¶¶ 56–57. The Plaintiff's generalized claims of such treatment do not create a genuine issue of material fact in view of his failure to identify any specific actions by Defendants which materially changed the terms or conditions of his employment. *See Galdi-*

*eri–Ambrosini,* 136 F.3d at 292 (stating that an adverse employment action is a necessary element of a retaliation claim). Plaintiff must endure a "materially adverse change in the terms or conditions of employment" to sustain an adverse employment action. *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 446 (2d Cir.1999). To be materially adverse, the change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000) (citing *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Crady,* 993 F.2d at 136.

The only allegation by Plaintiff that could rise to the level of an adverse employment action is Defendants alleged refusal to promote him to the position of Assistant Vice–President in the Human Resources Department. This claim is (legally) undermined by the evidence adduced by Defendants which clearly establishes that no such position existed in the Human Resources Department at Bronx–Lebanon. *See* Def. Mem., Ex. M (stating that "the President would not appoint a position of Assistant Vice President in the Human Resources Department"). In addition, the Plaintiff has failed to produce any evidence that he requested a promotion to, and was qualified for, such a position. *See Breland–Starling v. Disney Publ'g Worldwide,* 166 F.Supp.2d 826, 830 (S.D.N.Y. 2001) (holding that, "as a matter of law," a plaintiff cannot state a claim of retaliation based on the defendants' failure to promote the plaintiff to a position which did

not exist and was never occupied by anyone else at the company).

Plaintiff argues unpersuasively that the Defendants were going to create a new associate director position specifically for him but failed to do so in retaliation for his deposition testimony in the *Brown* case. The record does not support the Plaintiff's assertion. *See* Def. Mem., Ex. M (stating that Defendant Ortsman "needed an opportunity to work with the [Human Resources] Department for a period of time before [he] decided whether [an associate director] position needed to be created," and advising the Plaintiff that he "should not presume" that the decision to create a new position in Human Resources had been made). The record shows that the Plaintiff was informed that no decision regarding this new position had been made and that the Plaintiff's promotion to such position was dependent upon determinations that the position was necessary at Bronx–Lebanon and that the Plaintiff was the best person for the job. *See id.* The Plaintiff produced no evidence that the Defendants ever created an associate director position in Human Resources, or that he was qualified for and denied a promotion to this position. As a consequence, he cannot make out a failure to promote claim as a matter of law. *See Breland–Starling,* 166 F.Supp.2d at 830 (holding that a failure to promote claim requires the plaintiff to identify an existing position for which he is qualified).

## D. Supplemental Jurisdiction

The Court declines to exercise supplemental jurisdiction over Plaintiff's state and local law claims in light of the dismissal of all of the Plaintiff's federal causes of action. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial,

even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *see also* 28 U.S.C. § 1367(c)(3) (codifying existing case law and giving district courts discretion to decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction ...").[3]

## IV. Conclusion and Order

For the foregoing reasons, the Defendants' motion for summary judgment is granted in its entirety and the case is dismissed. The Clerk of the Court is respectfully directed to close this case.

---

**3.** New York courts apply similar standards as those applied by Federal courts in assessing discrimination, disparate pay, and retaliation claims under Title VII. "New York courts require the same standard of proof for claims brought under the [NYSHRL] as those brought under Title VII." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n. 4 (2d Cir.1995)). See also, e.g., *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n. 1 (2d Cir.1999) ("claims under the NYSHRL are analyzed identically to claims under ... Title VII, [and consequently] the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under ... Title VII") (citations omitted); *Farage v. Johnson–McClean Technologies*, No. 01 Civ. 4856, 2002 WL 1067824, at *6 (S.D.N.Y. May 29, 2002) ("The standards for analyzing discrimination claims

brought under the NYSHRL and the NYCHRL, including continuing violations, are the same as for those brought under Title VII."); *Walsh v. Covenant House*, 244 A.D.2d 214, 664 N.Y.S.2d 282, 283 (N.Y.A.D.1997) (noting that the NYSHRL and NYCHRL apply the federal standards, with the only difference being that the NYCHRL provides for punitive damages).

One difference between state and local laws and federal law is that, unlike Title VII, the NYSHRL and NYCHRL are governed by a three-year statute of limitations. N.Y. CPLR § 214(2); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998); *Farage*, 2002 WL 1067824. at *5 ("Under the NYCHRL and the NYSHRL, a plaintiff suing for discrimination must file a lawsuit within three years after the alleged unlawful practice").